William J. Wall, State Bar No. 203970
wwall@wall-law.com
**WALL & SON**
26895 Aliso Creek Rd. #B-110
Aliso Viejo, CA 92656
Telephone: (949) 387-4300
Facsimile: (949) 860-7890


Katherine E. Hollist (*pro hac vice* forthcoming)
kate@hollistcyberlaw.com
**HOLLIST CYBERLAW, PLLC**
4539 N. 22nd St #6653
Phoenix, AZ 85016
Telephone: (520) 842-5396

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **JOHN CRAWFORD**, an individual, **BRADLEY HUBER**, an individual, **KEITH ALBRECHT**, an individual, **YIFENG MEI**, an individual, **KENNETH PEACOCK**, an individual, **BETH SANCHEZ**, an individual, and **ZACHARY HOLLENKAMP**, an individual,<br><br>        Plaintiffs,<br><br>    v.<br><br>**FUNFLY PTE. LTD,** a Singapore limited company, and **LOOTBAR PTE. LTD,** a Singapore limited company,<br><br>        Defendants. | Case No.<br><br>**COMPLAINT AND DEMAND FOR JURY TRIAL** |

**COMPLAINT**

Plaintiffs John Crawford ("Crawford"), Bradley Huber ("Huber"), Keith Albrecht ("Albrecht"), Yifeng Mei ("Mei"), Kenneth Peacock ("Peacock"), Beth Sanchez ("Sanchez"), and Zachary Hollenkamp ("Hollenkamp") (each a "Plaintiff" and, collectively, "Plaintiffs"), by and through their attorneys, for their Complaint against Funfly PTE Ltd. ("Funfly") and Lootbar PTE Ltd. ("Lootbar") (collectively, "Defendants") allege, on knowledge as to their own actions, the investigation of Plaintiffs' counsel, and otherwise upon information and belief, as follows:

**PRELIMINARY STATEMENT**

1. This is a lawsuit against Defendants for falsely advertising price discounts for in-game purchases and other deceptive and unfair business practices in FunFly's mobile application game (or "app"), Last War: Survival ("Last War"). Last War is among the highest grossing mobile strategy games across both Apple and Android devices.

2. Last War has generated this revenue by offering players "microtransactions"—the ability, while in the game, to make discrete in-app purchases of in-game valuables necessary to level up one's account. These in-app purchases, or "packs," generally range in price from $0.99 to $99.99 each.

3. However, in its direct marketing to consumers (including representations made at the time of purchase), Defendants advertise former prices to induce players into believing they must act quickly to take advantage of a limited-time sale price.

4. Since Last War launched and continuing to approximately March 2026, Defendants deceived consumers by offering specific limited-time "bonuses" that purport to massively discount the price of in-game goods. They used strikethrough pricing and percentages to trick consumers into believing they were benefitting from limited-time promotions that substantially increased the value of their in-game purchases, especially in relation to purchases made by competing players. These purported savings are false, however, because the original pricing that these ads reference are fabricated.

5. These advertisements have run for years. But at no point, let alone within three months of the advertised discounts, have these in-game items ever actually been

COMPLAINT

offered at a non-discounted price—i.e., without their "limited-time" discounts. In other words, Defendants never sold these items at their "original" price. They offer false discounts from an original price that did not exist, and players bought packs on "sale" that were the same prices they would ordinarily pay.

6.      Furthermore, the advertised "original" pricing does not reflect the prevailing market retail pricing for these virtual in-game items, which have no real-world value and whose pricing is entirely determined by Defendants.

7.      The Federal Trade Commission ("FTC") describes these kinds of false former pricing schemes as deceptive:

> One of the most commonly used forms of bargain advertising is to offer a reduction from the advertiser's own former price for an article. If the former price is the actual, bona fide price at which the article was offered to the public on a regular basis for a reasonably substantial period of time, it provides a legitimate basis for the advertising of a price comparison. Where the former price is genuine, the bargain being advertised is a true one. If, on the other hand, the former price being advertised is not bona fide but fictitious – for example, where an artificial, inflated price was established for the purpose of enabling the subsequent offer of a large reduction – the "bargain" being advertised is a false one; the purchaser is not receiving the unusual value he expects. In such a case, the "reduced" price is, in reality, probably just the seller's regular price.

16 C.F.R. §233.1(a).

8.      California statutory and regulatory law also expressly forbids such pricing schemes. Specifically, Cal. Bus. & Prof. Code §17501 states:

> No price shall be advertised as a former price of any advertised thing, unless the alleged former price was the prevailing market price as above defined within three months next immediately preceding the publication of the advertisement or unless the date when the alleged former price did prevail is clearly, exactly and conspicuously stated in the advertisement.

9.      Defendants' tactics to induce players to spend tens, if not hundreds, of thousands of dollars each on purchases fall directly within the dark patterns—manipulative design practices—that the FTC identified in its September 2022 report, Bringing Dark Patterns to Light.[1]

---

[1] FTC Staff Report, *Bringing Dark Patterns to Light* (Sept. 14, 2022), available at

Case No.                                              2                                    **COMPLAINT**

10.     As the FTC Staff Report on Dark Patterns explains, "SCARCITY," such as a "False Low Stock Message," "[c]reate[s] pressure to buy immediately by saying inventory is low when it isn't."

11.     "URGENCY," like a "Baseless Countdown Timer" or "False Limited Time Message" or "False Discount Claims," also "[c]reate[s] pressure to buy immediately."

12.     Defendants knew, or reasonably should have known, that their comparative price advertising is false, deceptive, misleading, and unlawful.

13.     Defendants have fraudulently concealed from and intentionally failed to disclose to Plaintiffs the truth about their advertised price discounts and former prices.

14.     Through this false and deceptive marketing, advertising, and pricing scheme, Defendants have violated California laws prohibiting the advertisement of goods for sale as discounted from false former prices and prohibiting misleading statements about the existence and amount of price reductions.

15.     The claims and issues asserted herein are governed by California state law. The State of California has the greatest interest in policing corporate conduct occurring within the State.

16.     The Terms of Service to which Defendants seek to hold Plaintiffs contain a forum selection clause by which the parties purportedly submit to the exclusive jurisdiction of state and federal courts in San Francisco, California.

17.     Plaintiffs hereby seek restitution, injunctive relief, punitive damages, attorney's fees, and all other relief which the Court may deem appropriate.

## PARTIES, JURISDICTION AND VENUE

18.     Plaintiff John Crawford is a resident of Florida. He began playing Last War in May 2025. He purchased False Pricing Packs and False Limited Availability Packs (defined below) which he otherwise would not have purchased had he known about the deceptive

_____

https://www.ftc.gov/system/files/ftc_gov/pdf/P214800%20Dark%20Patterns%20Report%209.14.2022%20-%20FINAL.pdf [hereafter FTC Staff Report—Bringing Dark Patterns to Light].

advertising which he reasonably relied upon in making those purchases.

19.    Plaintiff Bradley Huber is a resident of Maryland. He began playing Last War in May 2025. He purchased False Pricing Packs and False Limited Availability Packs (defined below), which he otherwise would not have purchased had he known about the deceptive advertising, which he reasonably relied upon in making those purchases.

20.    Plaintiff Zachary Hollenkamp is a resident of Massachusetts. He began playing Last War in May 2025. He purchased False Pricing Packs and False Limited Availability Packs (defined below) which he otherwise would not have purchased had he known about the deceptive advertising which he reasonably relied upon in making those purchases.

21.    Plaintiff Keith Albrecht is a resident of Minnesota. He began playing Last War on server 1616 in May 2025. He purchased False Pricing Packs and False Limited Availability Packs (defined below) which he otherwise would not have purchased had he known about the deceptive advertising which he reasonably relied upon in making those purchases.

22.    Plaintiff Beth Sanchez is a resident of Texas. She made her first purchase in Last War in June 2025. She purchased False Pricing Packs and False Limited Availability Packs (defined below) which she otherwise would not have purchased had she known about the deceptive advertising which she reasonably relied upon in making those purchases.

23.    Plaintiff Yifeng Mei is a resident of California. He began playing Last War in May 2025. He purchased False Pricing Packs and False Limited Availability Packs (defined below) which she otherwise would not have purchased had he known about the deceptive advertising which she reasonably relied upon in making those purchases.

24.    Plaintiff Kenneth Peacock is a resident of Oklahoma. He began playing Last War in June 2025. He purchased False Pricing Packs and False Limited Availability Packs (defined below) which she otherwise would not have purchased had he known about the deceptive advertising which she reasonably relied upon in making those purchases.

25. Defendant FunFly is a Singapore entity which binds all U.S. players to litigate any claims against it in the state and federal courts of San Francisco, California, under California law.

26. Defendant Lootbar is a Singapore entity which binds all U.S. players to litigate any claims against it in the state and federal courts of San Francisco, California, under California law.

27. This Court has diversity jurisdiction over this action. Pursuant to 28 U.S.C. §1332(a), this Court has original jurisdiction because all Plaintiffs are diverse from all Defendants, and Defendants are subjects of a foreign state.

28. This Court has personal jurisdiction over Defendants because Defendants have purposefully availed themselves of the California market and California law by their Terms of Service, which bind the parties to litigate in state and federal courts in San Francisco, California, and have thereby consented to this Court's personal jurisdiction.

29. Venue is proper in this District under 28 U.S.C. §1391(b)(3), in that there is no district in which an action may otherwise be brought and Defendants are both subject to this Court's personal jurisdiction with respect to this action.

### INTRADISTRICT ASSIGNMENT

30. Because a substantial portion of the parties' claims arise in San Francisco due to the forum selection provisions contained in the Terms of Service, pursuant to Local Civil Rule 3-2, this action should be assigned to the San Francisco Division.

### FACTUAL ALLEGATIONS

31. Last War is a mobile application strategy game developed and operated by Defendants and available on iPhone and Android devices through the Apple App Store, Samsung Galaxy Store, Amazon Appstore, and Google Play platforms. Last War is a historical fiction, strategy, and resource management game.

32. Last War belongs to a category of apps known as "freemium" apps. A freemium app is one in which users do not have to pay to commence playing a functional game—the game is free to download and start playing.

Case No.                                    5                                    **COMPLAINT**

33. The term freemium is a misnomer, however, as users are given multiple purchase opportunities, known as microtransactions or in-app purchases ("IAPs"), to augment their playing experience. Users can buy in-game currency and virtual items using IAPs or, in some cases, by using off-app purchases ("OAPs") via websites, such as via lastwar.com and lootbar.com.

34. The popularity of freemium apps featuring in-app purchases has skyrocketed. In 2022, 97% of apps in the Google Play app store were free-to-download.[2] Even so, in-app purchases accounted for 48.2% of mobile app earnings.[3] Last War has generated over $500 million since its release.

35. Because users can try the app for free, freemium apps acquire new users more rapidly than purchase-to-play apps. Enabling microtransactions at various points throughout game play allows users time to develop app loyalty and engagement before having to pay anything. The continued microtransactions also remove the upper limit of user spending.[4]

36. Most of freemium app revenue is generated by big-spending "whales." In 2017, just 6% of customers on Apple's App Store accounted for 88% of all spending on games.[5]

37. Last War has generated hundreds of millions in revenue since its inception. It makes this revenue by offering players IAPs as well as OAPs. These purchases include building material, "recruitment banners," speed-ups, and other valuables. The most common form of in-app purchases is for bundled groups of resources, or "packs," generally ranging in price from $0.99 to $99.99 each.

---

[2] https://www.statista.com/statistics/263797/number-of-applications-for-mobile-phones.

[3] https://www.businessofapps.com/guide/in-app-purchases.

[4] Savannah Wei Shi, et al., *From Minnows to Whales: An Empirical Study of Purchase Behavior in Freemium Social Games*, Int'l J. of Elec. Com. (2015).

[5] *Epic Games, Inc. v. Apple Inc.*, 559 F. Supp. 3d 898, 954 (N.D. Cal. 2021), *aff'd in part, rev'd in part and remanded on other grounds*, No. 21-16506, 2023 WL 3050076 (9th Cir. Apr. 24, 2023).

Case No.                                    6                                    **COMPLAINT**

38.     Players engage in "microtransactions" to make IAPs and OAPs containing items that are necessary to progress their account further and maintain competitiveness with other players. This business model contrasts with that of many other popular free apps which offer only non-essential or cosmetic items for purchase. Because Last War offers in-app benefits that advance one's account in direct proportion to the amount of money spent by a player and confer advantages not reasonably attainable by in-game labor alone, it is most accurately classified as a "Pay to Win" mobile game.

39.     In other words, a player who spends money in the game will be more powerful in relation to players who choose not to spend money in the game. The game leverages this by bombarding players with advertisements and invitations to buy additional packs and resources whenever they reach a point in the game where their progress has stalled. The game's model is designed to create a sense of urgency around the purchase of in-game resources, and Last War further capitalizes on this sense of urgency by suggesting that purchases are limited-time offerings made available at a substantial discount.

40.     FunFly additionally operates an external website, lastwar.com, where players can make purchases that circumvent the Appstore and Google Play store, which uses the same tactics but offers purchases at an additional discount when purchased in large bulk. Lootbar offers the same service via lootbar.gg, in concert with FunFly.

41.     The strategies described above to induce players to spend upwards of hundreds of thousands of dollars each are a few of the many deceitful tactics, known as "dark patterns," employed within Last War. "Dark patterns" refer to "a[ny] user interface carefully crafted to trick users into doing things they might not otherwise do," causing players to "engage accidently or unwittingly in monetization activities thereby generating more income for the developer."[6]

---

[6] Dan Fitton, Janet C Read, *Creating a Framework to Support the Critical Consideration of Dark Design Aspects in Free-to-Play Apps*, Assoc. for Computing Machinery 407 (2019), available at https://dl.acm.org/doi/pdf/10.1145/3311927.3323136.

Case No.                                          7                                  **COMPLAINT**

42.     As the computer and behavioral scientist Chris Lewis[7] writes, "[t]hese dark patterns violate user expectations by encouraging them to give up or jeopardize some resource to an extent that they were not expecting (time, money, social capital)."[8]

43.     Indeed, and as further described below, many of Last War's tactics to induce players to spend thousands, tens of thousands, and even hundreds of thousands of dollars on a "free game" fall directly within the dark patterns that the FTC identified in its September 2022 report, *Bringing Dark Patterns to Light*.[9]

44.     Prior to downloading Last War and making purchases, the "Pay-to-Win" nature of the game is withheld or obscured from promotional material directed at potential consumers through various social media channels.  Defendants invest in producing highly elaborate advertisements that suggest a fast-paced game with rousing visuals. The advertisements are designed to give the impression that they depict in-game footage. This, however, is false.

45.     Once a player downloads the game, they are placed automatically into a specific server, along with several thousand players who also created their accounts at a similar time. In stark contrast to the advertisements, a player plays by tapping on various icons of buildings surrounding a stronghold upon a mostly visually-simple, two-dimensional, and inert map.  They are immediately tasked with upgrading their facilities. They must do this to strengthen their combat abilities and therefore maintain a competitive position among other players in the server.

46.     The purpose of the game is to advance one's strength accumulating resources to complete these upgrades. The players join large alliances of other players that compete for dominance within the server and in cross-server battles through various in-game events.

---

[7] Chris Lewis, Irresistible Apps: Motivational Design Patterns for Apps, Games, and Web-based Communities (1st ed. 2014).

[8] Lewis, *supra* note 7 (internal quotations omitted).

[9] FTC Staff Report—Bringing Dark Patterns to Light.

Case No.                                   8                              **COMPLAINT**

47.    In order to progress past a certain level in the game, it is necessary to purchase in-app "packs" that contain the required items to level up one's account in the game. These essential items require spending real money, as they are otherwise only available in insufficient amounts through in-game labor alone to make upgrades feasible.

48.    After a few days of playing and regularly making upgrades, the cost to acquire the materials needed to make subsequent upgrades increases exponentially.

49.    In other words, Last War is made up of feedback loops—the output of the system becomes the input for the next iteration of the system. Every action made in the game thus gives the user access to future actions, giving users a sense of player progress and motivation.

50.    At the beginning of the game the time between input and output is immediate and allows the user to complete the next action right away. But as the user performs more actions and levels up in the game, the time between input and output increases. There comes a point in the game where the user can no longer advance due to the time required to complete the next action. At this point, without making an in-app purchase, the user is at a standstill.

51.    Because users are so accustomed to short wait times or using the speed up, skip, or coin (spending in-game resources) features, by the time this standstill occurs (that is, if no additional purchases are made), a user is predisposed to make IAPs and OAPs.

52.    If a player does not make any purchases in the game, it would require *years* of playing hours each day, 365 days a year, to gather the necessary resources to achieve competitive power levels.

53.    On Reddit.com, players attempt to aggregate data in an attempt to estimate the resources upgrades will cost, since Defendants intentionally hide this information and it does not become available to players until they reach each upgrade level. These player estimates show the deceptive scaling of investment; while it would take approximately 360 days for a player to reach the level 30 upgrades, it would take over **1,270 days** for that player to achieve the level 35 upgrades:

| Building | Level | Iron | Food | Gold | Oil (S2+) | Time | Total |
|---|---|---|---|---|---|---|---|
| Any Tech Center | 30 | 1.17 G | 1.17 G | 360.00 M | 0 | 29d 23h | |
| Barracks | 30 | 648.00 M | 648.00 M | 261.00 M | 0 | 25d 15h | |
| Any Tank/Air/Missile Center | 30 | 990.00 M | 324.00 M | 207.00 M | 0 | 25d 15h | 360d 22h |
| HQ Expansion Lv1 (Tech) | 30 | 617.82 M | 617.82 M | 1.83 G | 4.08 M | 242d 1h | |
| HQ | 31 | 1.44 G | 1.44 G | 459.00 M | 1.30 M | 37d 17h | |
| Any Tech Center | 31 | 1.26 G | 1.26 G | 396.00 M | 729.00 K | 32d 23h | |
| Barracks | 31 | 711.00 M | 711.00 M | 288.00 M | 324.00 K | 28d 5h | |
| Any Tank/Air/Missile Center | 31 | 1.08 G | 360.00 M | 225.00 M | 506.25 K | 28d 5h | 168d 14h |
| Wall | 31 | 1.44 G | 477.00 M | 306.00 M | 607.50 K | 37d 17h | |
| HQ | 32 | 1.53 G | 1.53 G | 504.00 M | 2.07 M | 41d 12h | |
| Any Tech Center | 32 | 1.35 G | 1.35 G | 441.00 M | 1.17 M | 36d 7h | |
| Barracks | 32 | 783.00 M | 783.00 M | 315.00 M | 518.40 K | 31d 2h | |
| Any Tank/Air/Missile Center | 32 | 1.17 G | 396.00 M | 252.00 M | 810.00 K | 31d 2h | |
| Hospital | 32 | 396.00 M | 1.17 G | 315.00 M | 388.80 K | 31d 2h | 195d 20h |
| Drill Ground | 32 | 261.00 M | 783.00 M | 207.00 M | 388.80 K | 20d 16h | |
| HQ | 33 | 1.71 G | 1.71 G | 558.00 M | 3.53 M | 45d 16h | |
| Any Tech Center | 33 | 1.53 G | 1.53 G | 486.00 M | 1.98 M | 39d 22h | |
| Barracks | 33 | 864.00 M | 864.00 M | 342.00 M | 881.28 K | 34d 5h | |
| Any Tank/Air/Missile Center | 33 | 1.26 G | 432.00 M | 279.00 M | 1.38 M | 34d 5h | |
| Alliance Center | 33 | 288.00 M | 864.00 M | 279.00 M | 495.72 K | 22d 18h | 266d 4h |
| Wall | 32 | 1.53 G | 522.00 M | 333.00 M | 972.00 K | 41d 12h | |
| Wall | 33 | 1.71 G | 576.00 M | 369.00 M | 1.65 M | 45d 16h | |
| HQ | 34 | 1.80 G | 1.80 G | 585.00 M | 6.35 M | 47d 23h | |
| Any Tech Center | 34 | 1.62 G | 1.62 G | 513.00 M | 3.57 M | 41d 22h | |
| Barracks | 34 | 900.00 M | 900.00 M | 360.00 M | 1.59 M | 35d 22h | |
| Any Tank/Air/Missile Center | 34 | 1.35 G | 450.00 M | 288.00 M | 2.48 M | 35d 22h | |
| Hospital | 33 | 432.00 M | 1.26 G | 342.00 M | 660.96 K | 34d 5h | 280d 19h |
| Hospital | 34 | 450.00 M | 1.35 G | 360.00 M | 1.19 M | 35d 22h | |
| Drill Ground | 33 | 288.00 M | 864.00 M | 234.00 M | 660.96 K | 22d 18h | |
| Drill Ground | 34 | 306.00 M | 900.00 M | 243.00 M | 1.19 M | 23d 21h | |
| HQ | 35 | 1.89 G | 1.89 G | 612.00 M | 12.69 M | 50d 8h | |
| Total | | 32.77 G | 30.55 G | 12.55 G | 54.15 M | 1272d 10h | 1272d 10h |

54.     Defendants build off the compulsive feedback loops that their game intentionally creates to induce Plaintiffs and other players to spend upwards of hundreds of thousands of dollars each.[10] Last War reminds players that instead of devoting countless

---

[10] Last War also employs compulsion loops, a sinister-sounding term for a simple process. To create a compulsion loop, game developers make users anticipate a reward, such as a more powerful sword or the prospect of traveling to a new game area. Next, users are given a challenge, such as killing monsters or solving a puzzle. By completing the challenge, the user earns their anticipated reward, which in turn presents or unlocks more challenges for yet more rewards (*e.g.*, the new game area includes a new quest giver). Compulsion loops can lead to compulsive behavior. Adrian Hon, *You've Been Played: How Corporations, Governments, and Schools Use Games to Control Us All*, p. 144. Last War

Case No.                                    **COMPLAINT**

hours to progress in the game, they can simply purchase packs. The game designs these upgrades to lure players into spending money on resources.

55.     These in-game advancements all cost players real money. The packs necessary for these advancements are generally offered at the following prices: $99.99, $49.99, $19.99, $9.99, $4.99, $1.99, and $0.99. The advertisements for a particular pack at different pricing levels usually have similar graphical advertisements but contain varying amounts of items in proportion to their price.

56.     The true cost of obtaining any power level is never made clear to the player because Defendants know that players would not be willing to pay this price if they were aware of the total cost up front. After all, these are players who specifically selected a free-to-play game instead of spending $20 to $60 on a traditional video game that is available for one-time purchase, and with the same mechanics.

57.     Knowing this, Defendants instead leverage the incremental upgrade system to spread this total cost over numerous separate upgrades, all while keeping consumers in the dark. There is no in-game mechanism to review one's purchase history or the total amount one has spent. Costs are only shown for those items or advancements for which the player is currently eligible, meaning Defendants hide the explosive, exponential costs of in-game upgrades until the game's players have already invested months of time and money into the game.

58.     Once players are fully invested, Defendants then use packs to create a false sense of urgency and scarcity to pressure players into making several dozen smaller purchases over a period of days, weeks, or months.

59.     In other words, at no point are players told it will cost them thousands to

---

likewise employs treatmills, a refinement of compulsion loops, where incremental gains are constantly doled out, with the intention of engaging players indefinitely. Treatmills are designed to ensure the game occupies an enormous amount of a user's time, stays relevant as long as possible, and as a result maximizes the time where a user might refer the game to a friend. Games can easily consume hundreds of hours of users' time by incrementally unlocking a few more secrets and a few more power-ups after every loop. *Id.* at 152.

Case No.                                             11                                    **COMPLAINT**

advance a single level after the first thousand dollars are spent. Instead, they are bombarded with an endless series of advertisements urgently offering limited-time sales, each providing the opportunity to purchase just the incremental resources needed at the time to reach the next level of upgrade.

60.   Defendants follow this model intentionally to foster dangerous consumer behaviors that ultimately result in more purchases, at the expense of their players.

61.   Research into microtransactions and human behavior shows that a critical link between microtransaction purchases and problem gaming behavior (*i.e.*, behavior associated with gambling addiction) forms with high frequency purchases.[11] Of note, "Both classical and operant conditioning theories suggest that more frequent events or quicker pay out frequencies could increase the likelihood of problematic microtransaction purchase behavior and problem gambling symptoms through reinforcement."[12]

62.   Thus, by luring players into making several smaller, time-sensitive purchases of purportedly high-value packs, Defendants specifically intend to foster addictive behaviors by luring consumers into dangerous spending habits.

63.   As a result of Defendants' predatory monetization schemes and false advertising, numerous players, like Plaintiffs, end up spending tens of thousands—if not hundreds of thousands—of dollars on Last War.

64.   As an editorial in the Society for the Study of Addiction has observed:

> Predatory monetization schemes in video games are purchasing systems that disguise or withhold the long-term cost of the activity until players are already financially and psychologically committed. Such schemes contribute to the increasing similarity of gaming and gambling and the potential for financial harm for those with Internet gaming disorder.
>
> . . .

---

[11] Erin Gibson et. al, *The relationship between videogame micro-transactions and problem gaming and gambling: A systematic review*, 131 Computers in Human Behavior 107219 (2022).

[12] *Id.*

Case No.                                                        12                                          **COMPLAINT**

Game monetization schemes have become increasingly sophisticated and have been featured more prominently within popular on-line games. In our view, some of these schemes could be considered predatory. Predatory monetization schemes typically involve in-game purchasing systems that disguise or withhold the true long-term cost of the activity until players are already financially and psychologically committed. Such schemes are designed to encourage repeated player spending using tactics or elements that may involve, either singularly or in combination, limited disclosure of the product; intrusive and unavoidable solicitations; and systems that manipulate reward outcomes to reinforce purchasing behaviors over skillful or strategic play. Such strategies may exploit inequalities in information between purchaser and provider, such as when the industry uses knowledge of the player's game-related preferences, available funds and/or playing and spending habits, to present offers predetermined to maximize the likelihood of eliciting player spending.[13]

65.    Layered on top of its predatory and addictive monetization schemes, Last War relies on four primary categories of deceptive pack advertisements within Last War: (a) packs that offer the illusion of price discounts through the false percentage value graphics, hereafter referred to as "False Pricing Packs"; (b) packs that falsely allege the limited availability of purchases, hereafter referred to as "False Limited Availability Packs"; and (c) items that "randomly" generate an in-game prize once purchased, hereafter referred to as "Loot Boxes." Any deceptively advertised pack can belong to more than one of these categories simultaneously or may be deceptive for a separate reason outside of the ones belonging to the four main categories.

66.    However, these advertisements are false, deceptive, and intended to mislead players into making in-app purchases that they otherwise would not have made.

67.    Defendants falsely promote these packs as being on sale or discounted by misrepresenting that such packs are currently being offered at a lower price than normal, include limited-time bonuses that purport to substantially increase the value of the packs, or have limited availability. Since the game pits players against each other, there is significant pressure on players to take advantage of these limited-time offerings so that they can gain a competitive edge against opponents who presumably are left to pay full

---

[13] https://onlinelibrary.wiley.com/doi/epdf/10.1111/add.14286.

Case No.                                  13                                  **COMPLAINT**

price.

68.    Additionally, the advertisements mislead players into believing they will find themselves at a competitive *disadvantage* if they do not purchase packs now, since they will be left paying full price for items their opponents were able to purchase at a discount.

**False Pricing Packs**

69.    The False Pricing Packs display an advertised price for which the pack is currently offered. On the right side of the description of the pack is a percentage that indicates the "value" of this pack is astronomically higher than it actually is. The advertisements suggest that the pack was formerly offered at a higher price but is now heavily discounted:



70.    However, these packs were in fact never offered at the advertised former reference price.

71.    There are dozens of False Pricing Packs sold at multiple pricing tiers, especially across the $4.99, $9.99, and $19.99 pricing tiers. None of these packs were

ever offered at the former reference prices.

72. Defendants use false reference pricing schemes to increase sales because they know the reference prices influence purchasing decisions, as consumers want bargains. Fake discounting and false reference prices are widely recognized to be powerful tools in convincing customers to make purchases, and this issue has been studied repeatedly. As one recent research study from the Harvard Business School summarized:

> Taken together, evidence from our analysis of observational transaction data and our laboratory experiment suggests that fake prices provide sellers with a powerful tool to enhance demand, but one that may come at the expense of misleading consumers about products' true initial selling prices. Consumers take initial prices as signals of product quality and rate offers as being better deals the higher these initial prices are with respect to present selling prices. Accordingly, fake prices have the highest influence on purchase likelihood for less-informed consumers.
>
> . . .
>
> By definition, a fake price offers a fake discount—a discount that does not represent a decrease from some previous selling price but, rather, the difference between the current selling price and a fake introductory price. There is much existing literature on the impact of discounts on consumer behavior beyond . . .[14]

73. Defendants had actual knowledge that the False Pricing Packs contained false or misleading representations as to their former prices. Defendants designed and promoted these advertisements from inception until the present day, as the practice of offering these deceptive packs continues.

74. The price at which a pack is obtained is a material consideration when reasonable players, including Plaintiffs, decide to make purchases. Players seek to maximize the amount of items obtained from the pack for the lowest cost. Defendants deceive players into taking advantage of discounts so that players believe they may

---

[14] Donald Ngwe, *Fake Discounts Drive Real Revenues in Retail,* Harvard Business School Working Paper (2018) (available at https://www.hbs.edu/ris/Publication%20Files/18-113_16977967-84c0-488d-96e5-ffba637617d9.pdf).

achieve a competitive advantage on the mistaken belief that other players may have to pay the substantially higher non-discounted price for the same number of items.

75.     Plaintiffs reasonably relied on the "strikethrough" pricing when purchasing numerous False Pricing Packs. Had Plaintiffs known the "strikethrough" pricing was false, Plaintiffs would not have purchased many of the False Pricing Packs that they purchased.

76.     If Plaintiffs could ever have reasonably realized that the False Pricing Packs were never sold at the original reference price, such realization would have occurred only after enough game play that Defendants would have already achieved their goal of establishing addictive spending habits. Thus, to the extent Plaintiffs continued to make purchases after developing an understanding that the packs were never offered at the original price, this was the calculated and intended result that Defendants sought when engaging in this deceptive and unfair practice in the first place.

**False Limited Availability Packs**

77.     The False Limited Availability Packs indicate that a particular pack can only be purchased a finite number of times. These advertisements create a sense of artificial scarcity whereby players are pressured into purchasing packs containing valuable items to enhance their accounts, ostensibly to simultaneously deprive competitors from accessing the same packs.

78.     Defendants also use graphics indicating a "Remaining Time" during which the pack will remain available to create a false sense of scarcity with its users.

79.     However, Defendants' representations as to the scarcity of the packs are false. Other players are also able to purchase these packs even if another player buys all of the supposedly remaining packs. Furthermore, the player who purchased the False Limited Availability Pack is often offered the same pack to purchase again, especially at the $99.99 pricing tier.

80.     Defendants intentionally designed the packs to mislead players into believing that they were limited in availability. Defendants knowingly added a message to players communicating an artificial scarcity to induce them to make IAPs and OAPs.

Case No.                                          16                                **COMPLAINT**

81. In addition, Defendants cautioned players that these Limited Availability Players were necessary to remain competitive, luring players to "Stay one step ahead to secure a significant advantage."



82. These false and deceptive tactics of scarcity and urgency are effective dark patterns.

83. As the FTC explained, "SCARCITY" includes variants such as the "False Low Stock Message" (e.g., "Only 1 left in stock—order soon"), which falsely claim inventory is low. This message "[c]reate[s] pressure to buy immediately."

84. "URGENCY" includes variants such as the "Baseless Countdown Timer" ("Offer ends in 00:59:48"), which shows a clock that goes away or resets when it times out;

"False Limited Time Message" ("Deal ends soon"), which presents a meaningless deadline that resets when reached; or "False Discount Claims" ("Sale"). All of these variants create pressure to buy immediately.

85.    Plaintiffs reasonably relied on the textual advertisements of supposed scarcity accompanying the ad copy as a material consideration in purchasing those packs and other IAPs and OAPs. Had the Plaintiffs known the packs were not actually scarce or limited, they would not have made such purchases.

**Loot Boxes**

86.    Amplifying the addictive features of Last War, Defendants also entice players to purchase Loot Boxes.

87.    The use of Loot Boxes within Last War encourages further and unregulated problem gambling behavior[15] by providing players with the opportunity to purchase items that yield randomized awards—mirroring gambling through uncertainty in the outcomes of spending.

88.    Loot Boxes allow players to purchase virtual "chances" to win rare in-game items, but most players win only common virtual items, which can often be purchased for far less than what the players spend on a "chance" at rare in-game loot.

89.    Loot Boxes are classified as a type of "monetary dark pattern," and as such Last War, "a video game that employs loot boxes[,] is just utilizing the 'monetized rivalries' dark pattern"—the exploitation of user competitiveness which encourages players to spend money they would not otherwise spend, in order to achieve status.[16]

90.    Further, academic literature on the subjects of predatory monetization and addiction to loot-box-microtransactions suggests that there is a link between chance-based

---

[15]  Matthew E. Perks, "Regulating In-Game Monetization: Implications of Regulation on Games Production," (2021), available at https://www.jstor.org/stable/pdf/j.ctv1hp5hqw.14.pdf?refreqid=excelsior%3Ae35b9894f003556c7dff9d435726e0dc&ab_segments=0%2Fbasic_search_gsv2%2Fcontrol&origin=&acceptTC=1, p. 221.

[16] Lewis, *supra* note 7.

Case No.                                           18                                   **COMPLAINT**

gambling and player behavior on these apps. Studies in psychology show that loot box consumption mimics gambling as it involves the betting and spending of real currency for unpredictable in-game rewards, with the ambiguity of the valuation for in-game vs. real-world currency making this a habit that is easy to fall into.[17]

91.    The similarities between gambling and Loot Boxes are especially dangerous for individuals who are already problem gamblers, as the high degree of likeness to other forms of gambling may cause them "to spend large amounts of money on buying loot boxes in games, just as they would spend large amounts of money on other forms of gambling."[18]

92.    This is particularly problematic because studies have repeatedly confirmed that problematic and pathological gambling habits develop at a higher rate among those who participate in virtual, online gambling activities.[19]

93.    Additionally, younger individuals (those under 30 and, in particular, those under 18) are particularly susceptible to developing problematic gambling pathologies, including gambling addiction.[20]

94.    Upon information and belief, Defendants are aware of the addictive nature of Loot Boxes and have designed Last War and advertisements for IAPs and OAPs

---

[17]  Tom Brock, Mark Johnson, *The Gamblification of Digital Games*, 21 J. Consumer Culture (2021) available at https://journals.sagepub.com/doi/full/10.1177/1469540521993904.

[18] David Zendle, Paul Cairns, *Video Game Loot Boxes are Linked to Problem Gambling: Results of a Large-scale Survey*, PLOS ONE (2018), available at https://journals.plos.org/plosone/article?id=10.1371/journal.pone.0206767.

[19] *See, e.g.*, Brunelle, Leclerc, Cousineau, Dufour, Gendron, & Martin, *Internet gambling, substance use, and delinquent behavior: An adolescent deviant behavior involvement pattern*, 26 Psych of Addictive Behaviors 365-70 (2012), available at https://doi.org/10.1037/a0027079.

[20] *See* Kristjansdottir *et al*, *Internet gambling and problem gaming among 13 to 18 year old adolescents in Iceland*, 9 Int'l J. Mental Health & Addiction 257 (2011), available at https://doi.org/10.1007/s11469-010-9280-7; *Gainsbury et al*, The Impact of Internet Gambling on Gambling Problems: A Comparison of Moderate-Risk and Problem Internet and Non-Internet Gamblers, 27(4) Psychology of Addictive Behaviors (2013), available at https://psycnet.apa.org/fulltext/2013-05953-001.pdf.

Case No.                                    19                              **COMPLAINT**

specifically to leverage consumer psychology in an effort to maximize consumer addiction and promote virtual gambling.

## CALIFORNIA LAW APPLIES TO ALL PLAINTIFFS

95.    California's substantive laws apply to every Plaintiff, regardless of where the Plaintiff resides.

96.    California's substantive laws may be constitutionally applied to the claims of Plaintiffs under the Due Process Clause, 14th Amend. §1, and the Full Faith and Credit Clause, Art. IV §1 of the U.S. Constitution. California has significant contacts, or significant aggregation of contacts, to the claims asserted by Plaintiffs, thereby creating state interests that ensure that the choice of California state law is not arbitrary or unfair.

97.    Defendants also secured Plaintiffs' agreements to their Terms of Service, which bound all Plaintiffs to litigate claims under California law.

## FIRST CLAIM FOR RELIEF

## Violation of California's Unfair Competition Law ("UCL")

## Cal. Business & Professions Code §§17200 *et seq.*

98.    Plaintiffs incorporate by reference all allegations in this Complaint and restate them as if fully set forth herein.

99.    The UCL defines unfair business competition to include any "unlawful, unfair or fraudulent" act or practice, as well as any "unfair, deceptive, untrue or misleading" advertising. Cal. Bus. & Prof. Code §17200.

100.    A business act or practice is "unlawful" under the UCL if it violates any other law or regulation.

101.    A business act or practice is "unfair" under the UCL if the reasons, justifications, and motives of the alleged wrongdoer are outweighed by the gravity of the harm to the alleged victims.

102.    A business act or practice is "fraudulent" under the UCL if it is likely to deceive members of the consuming public.

103.    Defendants have violated the "unlawful" prong under the UCL and have

Case No.                                          20                                    **COMPLAINT**

engaged in "unfair, deceptive, untrue or misleading" advertising.

104.    The Federal Trade Commission Act prohibits "unfair or deceptive acts or practices in or affecting commerce" (15 U.S.C. §45(a)(1)) and specifically prohibits false advertisements. 15 U.S.C. §52(a). FTC Regulations describe false former pricing schemes—similar to Defendants' False Pricing Packs in all material respects—as deceptive practices that would violate the FTC Act.

105.    16 C.F.R.§233.1 states:

(a)    One of the most commonly used forms of bargain advertising is to offer a reduction from the advertiser's own former price for an article. If the former price is the actual, bona fide price at which the article was offered to the public on a regular basis for a reasonably substantial period of time, it provides a legitimate basis for the advertising of a price comparison. Where the former price is genuine, the bargain being advertised is a true one. If, on the other hand, the former price being advertised is not bona fide but fictitious—for example, where an artificial, inflated price was established for the purpose of enabling the subsequent offer of a large reduction—the "bargain" being advertised is a false one; the purchaser is not receiving the unusual value he expects. In such a case, the "reduced" price is, in reality, probably just the seller's regular price.

(b)    A former price is not necessarily fictitious merely because no sales at the advertised price were made. The advertiser should be especially careful, however, in such a case, that the price is one at which the product was openly and actively offered for sale, for a reasonably substantial period of time, in the recent, regular course of his business, honestly and in good faith—and, of course, not for the purpose of establishing a fictitious higher price on which a deceptive comparison might be based. And the advertiser should scrupulously avoid any implication that a former price is a selling, not an asking price (for example, by use of such language as, "Formerly sold at $_____"), unless substantial sales at that price were actually made.

106.    California law also prohibits false former pricing schemes. Cal. Bus. & Prof. Code §17501, entitled "Value determinations; Former price advertisements," states:

For the purpose of this article the worth or value of any thing advertised is the prevailing market price, wholesale if the offer is at wholesale, retail if the offer is at retail, at the time of publication of such advertisement in the locality wherein the advertisement is published.

No price shall be advertised as a former price of any advertised thing, unless the alleged former price was the prevailing market price as above defined within three months next immediately preceding the publication of the advertisement or unless the date when the alleged former price did prevail is clearly, exactly, and conspicuously stated in the advertisement.

Case No.                                                                21                                              **COMPLAINT**

107. As further detailed in the Second Claim for Relief below, California's False Advertising Law also prohibits a business from "[a]dvertising goods or services with intent not to sell them as advertised," Cal. Civ. Code §1770(a)(9), and prohibits a business from "[m]aking false or misleading statements of fact concerning reasons for, existence of, or amounts of price reductions." Id. §(a)(13).

108. Defendants' False Pricing Packs, False Limited Availability Packs, and Loot Boxes violate the unlawful prongs of the UCL since they violate 16 C.F.R. §233.1, Cal. Bus. & Prof. Code §17501, and Cal. Civ. Code §§1770(a)(9) and (a)(13).

109. Defendants' use of the False Pricing Packs violates 15 U.S.C. §45(a)(1), 15 U.S.C. §52(a), and the FTC Guidelines published in Title 16, Code of Federal Regulations, Section 233.

110. Defendants also violated and continue to violate Cal. Bus. & Prof. Code §17501, and Cal. Civ. Code §1770, sections (a)(9) and (a)(13), by advertising false discounts from purported former prices that were, in fact, not the prevailing market prices within three months preceding the publication and dissemination of advertisements containing the false former prices.

111. Defendants have also violated the "unfair" prong of the UCL by falsely representing that its consumers received a discount from a referenced "original" former price of its False Pricing Packs, where, in fact, Defendants set an arbitrary price for the goods contained in these packs and then falsely represented that the packs had ever been offered for sale without their supposed discount.

112. Additionally, Defendants have violated the "unfair" prong of the UCL by falsely representing that their False Pricing Packs contained unique and specific increases in items or resources when, in fact, they contained the same resources and in-game items as they always do.

113. Defendants have also violated the "unfair" prong of the UCL by engaging in predatory practices designed to foster gambling addiction in consumers, in that they: (a) deploy their microtransactions in a way specifically designed to ensnare players into

Case No. _____                     22                     **COMPLAINT**

addictive spending habits; (b) falsely create a sense of urgency, scarcity, and value in order to secure addictive high frequency microtransactions, such as by deploying Loot Boxes, which exploit user competitiveness and foster addiction; and (c) use incremental cost step-ups to prevent players from realizing the true cost of the game and how much they have spent. Defendants' goals in engaging in these practices are far outweighed by the harm they cause.

114.   These acts and practices are unfair because they were likely to cause consumers to falsely believe that Defendants were offering value, discounts, or bargains from the prevailing market value or worth of the products sold that do not, in fact, exist. As a result, purchasers (including Plaintiffs) reasonably understood that they were receiving valuable price reductions on purchases of in-game items. This, in turn, has induced reasonable purchasers to buy such products from Defendants that they would not have otherwise purchased.

115.   The gravity of the harm to Plaintiffs resulting from these unfair acts and practices outweighs any conceivable reasons, justifications, or motives that Defendants may have had for engaging in such deceptive acts and practices.

116.   Additionally, Defendants have violated the "fraudulent" prong of the UCL because their marketing and advertising materials included false "original" prices for their False Pricing Packs, and because these same materials also suggested that the offers in the False Limited Availability Packs were unique, limited, and would no longer be available at those price points following the conclusion of its sale events. In actuality, the packs never contained the limited-time deals or discounts they purported to offer.

117.   Defendants' acts and practices deceived Plaintiffs. Specifically, Plaintiffs relied on these misleading and deceptive representations regarding the limited-time bonuses they could expect to receive in the packs. Each of these representations and deceptions played a substantial role in Plaintiffs' decisions to purchase the packs, and Plaintiffs would not have done so in the absence of such representations.

118.   Plaintiffs never received the benefit of their bargains with Defendants, in that

Case No.                                                    23                                          **COMPLAINT**

the "discounted" resources offered for sale in the packs did not give them the anticipated competitive edge against their opponents. Competitors could simply purchase packs at the same false sale pricing, or with the same number of items, or the same pack availability, notwithstanding Defendants' representations that these were limited-time offers.

119.   Similarly, players who purchased the False Pricing Packs defensively (to protect against becoming overpowered by opponents who they believed had been able to take advantage of the purportedly limited-time bonuses) were deprived of the benefit of their bargains, because the threat itself was a fabrication. There was never a risk of falling behind due to a player's failure to purchase items at their discounted price, because the price was always discounted.

120.   As a result of these violations under each of the fraudulent, unfair, and unlawful prongs of the UCL, Defendants have been unjustly enriched at the expense of Plaintiffs. Specifically, Defendants have been unjustly enriched by obtaining revenues and profits that they would not otherwise have obtained absent their false, misleading, and deceptive conduct.

121.   Through their unfair acts and practices, Defendants have improperly obtained money from Plaintiffs. As such, Plaintiffs request that this Court cause Defendants to restore this money to Plaintiffs, and to enjoin them from continuing to violate the UCL, and/or from violating the UCL in the future. Otherwise, Plaintiffs, and members of the general public, may be irreparably harmed and/or denied an effective and complete remedy if such an order is not granted.

## SECOND CLAIM FOR RELIEF

### Violation of California's False Advertising Law ("FAL")

### Cal. Business & Professions Code §§17500 *et seq.*

122.   Plaintiffs incorporate by reference all allegations in this Complaint and restate them as if fully set forth herein.

123.   The FAL prohibits unfair, deceptive, untrue, or misleading advertising, including, but not limited to, false statements as to worth, value, and former price.

Case No.                                    24                          **COMPLAINT**

124.    Furthermore, the FAL provides that: "No price shall be advertised as a former price of any advertised thing, unless the alleged former price was the prevailing market price as above defined within three months next immediately preceding the publication of the advertisement or unless the date when the alleged former price did prevail is clearly, exactly and conspicuously stated in the advertisement." Cal. Bus. & Prof. Code §17501.

125.    The False Pricing Packs misrepresent the existence of a sale whereby players can allegedly purchase packs at a discounted price, or with an increased percentage of items or resources. The False Limited Availability Packs misrepresent the exclusive nature, and therefore competitive value, of the packs.

126.    Through their unfair acts and practices, Defendants have improperly obtained money from Plaintiffs. As such, Plaintiffs request that this Court cause Defendants to restore this money to Plaintiffs, and to prevent Defendants from continuing to violate the FAL, and/or from violating the FAL in the future. Otherwise, Plaintiffs, and members of the general public may be irreparably harmed and/or denied an effective and complete remedy if such an order is not granted.

### THIRD CLAIM FOR RELIEF

### Violation of the California Consumers Legal Remedies Act ("CLRA")

### Cal. Civ. Code. §§1750 *et seq.*

127.    Plaintiffs incorporate by reference all allegations in this Complaint and restate them as if fully set forth herein.

128.    Plaintiffs are consumers within the meaning of Cal. Civ. Code §1761(d) and have engaged in a transaction within the meaning of Cal. Civ. Code §§1761(e) and 1770.

129.    Defendants are "persons" within the meaning of Cal. Civ. Code §§1761(c) and 1770, and they sell "goods or services" within the meaning of Cal. Civ. Code §§1761(a)–(b) and 1770.

130.    Last War and the in-app purchases are a "good" or "service" within the meaning of Cal. Civ. Code. §§1761(a) and (b).

131.    Defendants have violated Cal. Civ. Code. §1770(a)(5)'s proscription against

Case No.                                           25                                    **COMPLAINT**

representing that goods have characteristics, uses, benefits, or quantities that they do not have. The False Limited Availability Packs represent that they have the benefit of conferring a competitive advantage, but those benefits are illusory.

132. Defendants have violated Cal. Civ. Code. §1770(a)(9)'s proscription against advertising goods or services with intent not to sell them as advertised. The False Pricing Packs falsely advertise that a pack of goods has extra value by containing a significant increase in items or resources relative to normal versions of the same pack. The False Limited Availability Packs falsely indicate that a particular pack can only be purchased a finite number of times by competing players.

133. Defendants have violated Cal. Civ. Code. §1770(a)(13)'s proscription against making false or misleading statements of fact concerning reasons for, existence of, or amounts of, price reductions by misrepresenting the existence of discounts via False Pricing Packs, misrepresenting the existence of special sales through their False Pricing Packs, and misrepresenting the exclusive nature, and therefore competitive value, of the packs through their False Limited Availability Packs.

134. Defendants have violated Cal. Civ. Code. §1770(a)(14)'s proscription against representing that a transaction conferred rights or obligations that it did not have. The False Limited Availability Packs falsely represent that the purchase confers the right of a competitive advantage, which it does not.

135. Defendants have violated Cal. Civ. Code. §1770(a)(16)'s proscription against representing that the subject of a transaction has been supplied in accordance with a previous representation when it has not by misrepresenting that the purchasers have received a competitive advantage in the game by purchasing "sale" and "limited availability" items.

136. Defendants have violated Cal. Civ. Code. §1770(a)(17)'s proscription against representing that the consumer will receive an economic benefit, if the earning of the benefit is contingent on an event to occur subsequent to the consummation of the transaction, by misrepresenting that the purchaser of False Limited Availability Packs

would receive an economic benefit (i.e., more goods than other players) and therefore a competitive advantage as compared to players who did not take advantage of limited-availability sales. The economic benefit is contingent on other players not purchasing those same packs, but there is not actually a limited supply of packs.

137.   Plaintiffs suffered actual damages as a direct and proximate result of the Defendants' actions, concealment, and/or omissions in the advertising, marketing, and promotion of their in-app purchases, in violation of the CLRA, as evidenced by the substantial sums Defendants pocketed from Plaintiffs.

138.   Plaintiffs demand judgment against Defendants for injunctive relief and attorney's fees.

### FOURTH CLAIM FOR RELIEF

### Fraud

139.   Plaintiffs incorporate by reference all allegations in this Complaint and restate them as if fully set forth herein.

140.   Defendants represented to all Plaintiffs that various purchased packs were on sale in that they were offered at a lower price than normal, that certain packs were offered with an increased percentage of items and resources compared to their normal counterparts, and that pack purchases were only available in limited quantities.

141.   These representations were false because the packs were never offered at higher prices, the increased percentage versions of the packs were identical to their normal counterparts, the packs were not actually available in scarce quantities to other players in the State or to the individual player making the purchases, and the stated number of other players that had purchased the packs was fictitious.

142.   Defendants intentionally designed the graphical images on the advertisements to attract Plaintiffs to the enticing but false claims regarding the existence of sales, resource bonuses, and artificial scarcity.

143.   Plaintiffs reasonably relied upon the claims made in Defendants' advertisements in deciding to purchase the aforementioned packs.

Case No.                                                      27                                          **COMPLAINT**

144.    Upon purchasing the packs, Plaintiffs were harmed because, had Plaintiffs known Defendants' claims were false, they would not have made those purchases.

145.    Plaintiffs' reliance on Defendants' misrepresentations in their pack advertisements was a substantial factor in causing harm to Plaintiffs.

146.    Defendants' conduct has therefore caused and is causing immediate and irreparable injury to Plaintiffs and will continue to both damage Plaintiffs and the public unless enjoined by this Court.

## FIFTH CLAIM FOR RELIEF

### Unjust Enrichment

147.    Plaintiffs incorporate by reference all allegations in this Complaint and restate them as if fully set forth herein.

148.    Defendants misrepresented the value of the items or resources purchased in the False Pricing Packs, False Limited Availability Packs, and/or Loot Boxes or any packs for which Plaintiffs were double-charged.

149.    Plaintiffs spent tens, if not hundreds, of thousands of dollars each on items and resources, induced by Defendants.

150.    It would be unfair for Defendants to keep the money spent without compensating Plaintiffs.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for relief and judgment against Defendants as follows:

(a)    Awarding Plaintiffs compensatory damages and actual damages in an amount exceeding $75,000, to be determined by proof;

(b)    Awarding Plaintiffs appropriate relief, including actual and statutory damages;

(c)    For punitive damages;

(d)    For civil penalties;

(e)    For declaratory and equitable relief, including a declaration that Defendants violated and have continued to violate California's UCL, the FAL, and the CLRA, and an

injunction requiring Defendants to comply with California Business & Professions Code §§17200, *et seq*., and restitution and disgorgement;

(f)     For an order enjoining Defendants from continuing to engage in the wrongful acts and practices alleged herein;

(g)     Awarding Plaintiffs the costs of prosecuting this action, including expert witness fees;

(h)     Awarding Plaintiffs reasonable attorney's fees and costs as allowable by law;

(i)     Awarding Plaintiffs reasonable attorney's fees pursuant to Cal. Civ. Proc. Code 1021.5, as this lawsuit seeks the enforcement of an important right affecting the public interest and satisfies the statutory requirements for an award of attorney's fees;

(j)     Awarding Plaintiffs reasonable attorney's fees and costs, as well as injunctive relief, pursuant to the CLRA;

(k)     Awarding pre-judgment and post-judgment interest; and

(l)     Granting any other relief as this Court may deem just and proper.

Respectfully Submitted,

DATED: May 29, 2026                    **Wall & Son**

By:   */s/ William J. Wall*
            William J. Wall

and

**HOLLIST CYBERLAW, PLLC**
Katherine E. Hollist (*pro hac vice* forthcoming)

*Attorneys for Plaintiffs*

Case No.                                   29                                   **COMPLAINT**

**DEMAND FOR JURY TRIAL**

Plaintiffs, by and through their undersigned counsel, hereby demand a trial by jury for all questions of fact that can be decided by a jury in the above-entitled action.

Respectfully Submitted,

DATED: May 29, 2026          **Wall & Son**

By:   */s/ William J. Wall*
         William J. Wall

**HOLLIST CYBERLAW, PLLC**
Katherine E. Hollist (*pro hac vice* forthcoming)

Attorneys for Plaintiffs

Case No.                              30                             **COMPLAINT**